**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**UNITED STATES OF AMERICA**

    **Plaintiff,**

**v.**                                                   **CASE NO: 8:09-CR-141-T-33AEP**

**WILMER VIAMONTES,**

    **Defendant.**
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court by referral from the Honorable Virginia M. Hernandez Covington for a Report and Recommendation on Defendant's Motion to Suppress Physical Evidence (Dkt. No. 139) and the Government's Response in Opposition to Defendant's Motion to Suppress Physical Evidence (Dkt. No. 141). By his motion, Defendant seeks an Order suppressing at trial evidence seized from his truck and wallet. An evidentiary hearing was conducted on May 3, 2010.[1]

### Findings of Fact

The facts adduced at the evidentiary hearing established that on December 1, 2008, Detective Richard Morales of the Hillsborough County Sheriff's Office received information from the Miami-Dade Police Department connecting the residence at 14607 Walden Sheffield Road ("the residence") in Hillsborough County with a marijuana investigation in Miami. Specifically, the Miami-Dade Police Department conducted a court-authorized search warrant and recovered

---

[1] At the conclusion of the evidentiary hearing, defense counsel requested additional time to file supplemental authority. The Court granted the request and ordered that any supplemental authority be filed by May 4, 2010. No supplemental authority has been filed with the Court.

43 marijuana plants weighing approximately 155 pounds from a Miami residence. Inside the Miami residence, they found a piece of paper with the above address on it. The Miami-Dade police arrested Ecnar Reinoso, the brother of the listed owner of the residence, Eric Reinoso.

Based on this information, Detective Morales checked the electricity usage for the residence and learned that the usage was average for a house with that square footage. On December 9, 2008, Detective Morales contacted Steve Gupton, a Revenue Protection Investigator for the Tampa Electric Company (TECO), and indicated to Gupton that the residence may be connected with electricity theft based upon the information he was provided from the Miami-Dade police. Based upon the tip provided by Detective Morales, Gupton intended to inspect the meter at the residence because his job required him to investigate all tips, no matter what the source, relating to theft of electricity. As a Revenue Protection Investigator, one of Gupton's primary responsibilities was to identify and investigate any potential theft of electricity from TECO. As such, Gupton (or any other authorized TECO employee) was entitled to have access to the premises of a customer to inspect TECO equipment. Specifically, Section 2.2.1.1 of TECO's Rules and Regulations states:

Access to Premises

> The company and its representatives shall have access to the premises of the Customer at all reasonable times for the purpose of installing, maintaining, and inspecting or removing the company's property, reading meters, trimming trees, and other purposes incident to the performance or termination of the company's agreement with the Customer. The company and its representatives shall not be liable to the Customer for trespass.

*See* Gov. Ex. No. 1.

Upon Detective Morales' request, Gupton coordinated his inspection of the residence with Detective Morales' schedule so that Detective Morales could be within close proximity to the residence when Gupton conducted his inspection. Gupton conducted his inspection on December 9, 2008. Upon arrival at the residence, Gupton went to the rear of the house to check the meter, while Detective Morales remained in his car parked nearby.[2] A few minutes later, Gupton called Detective Morales on his cell phone informing him that he had observed a tap used to divert unmetered electricity into the residence. Detective Morales then left his car and began to approach the front door of the residence when he heard Gupton talking to an unknown male at the rear of the residence. Detective Morales proceeded towards the rear of the residence and approached the subject, who identified himself as Wilmer Viamontes (the "Defendant"). Detective Morales asked the Defendant if he was the owner of the residence. The Defendant indicated that he was not the owner, and that the owner was inside the residence. Detective Morales requested that the Defendant get the owner of the house so that he could talk to him. The Defendant agreed and proceeded to an entrance into the residence from the back yard. Detective Morales asked the Defendant if he could accompany the Defendant into the back yard, and the Defendant agreed.

Upon approaching the back porch/deck of the residence, Detective Morales met with Alfredo Rijo, who was identified as the owner of the residence. On the back porch/deck of the residence, Detective Morales explained to Rijo, in the presence of the Defendant, the nature of his investigation, and requested Rijo's consent to enter the residence. Rijo granted Detective Morales

---

[2] The Court notes that Detective Morales was accompanied by his partner, Detective Ruhl, during the entirety of this investigation. For purposes of this Motion, the Court need only address the actions of Detective Morales.

request to enter the residence. Inside the residence, Detective Morales talked with the Defendant, Rijo, and a third individual identified as Eric Reinoso. Detective Morales specifically advised the three men that he had received information that marijuana was being cultivated within the residence, and pointed to items he observed at the residence, i.e., the illegal tap into the electricity, buckets, and bags of GrowDan, a plant medium used to grow marijuana. Detective Morales asked Rijo for consent to search the residence. Rijo gave Detective Morales consent to search, and eventually indicated that the marijuana plants were in the garage. Inside the garage, Detective Morales observed numerous marijuana plants.

Detective Morales then proceeded to interview each of the men. The Defendant signed a waiver of *Miranda* rights and consent to be interviewed form (Gov. Ex. No. 3), and a consent to search form his truck (Gov. Ex. No. 2). Detective Morales observed GrowDan particles in the bed of the Defendant's truck, and advised the Defendant that the truck would be seized. After searching the truck and interviewing the Defendant, Detective Morales arrested the Defendant. Before transporting the Defendant to jail, Detective Morales asked the Defendant if he had any possessions inside the house that he wanted to bring with him to the jail. The Defendant indicated that he wanted to take his cell phone and wallet, which were inside the residence. Detective Morales then escorted the Defendant into the residence so that the Defendant could identify his wallet and cell phone. Detective Morales testified that he told the Defendant that if the Defendant took his wallet with him it would be searched at the jail, and asked the Defendant for permission to search the wallet. According to Detective Morales, the Defendant gave him consent to search the wallet. Inside the wallet, Detective Morales found a receipt dated 12/8/2008, which showed a purchase of 12 bags of GrowDan, and a purchase of two 2.4 gallon bottles of ClearX for a total

4

of $795.44 which was paid in cash. Additionally, Detective Morales found a receipt dated 9/10/2008, to the Blossoms Experience in Miami totaling $2,498.88. Detective Morales also found a business card listing various items including Ph Down, which is commonly used in marijuana grow operations to assist in the Ph levels, and ¾ inch hoses. Detective Morales testified that upon confronting the Defendant with the discovery of the receipts, the Defendant said that he did not know where the receipts came from, and that he had not given Detective Morales permission to search his wallet.

Analysis

Defendant premises his motion on the Fourth Amendment of the United States Constitution, which provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . . .

U.S. Const. amend. IV. A warrantless search is presumed to be unreasonable. *Payton v. New York*, 445 U.S. 573 (1980); *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). However, the Fourth Amendment's prohibition of warrantless searches is not absolute and is subject to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973); *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). The government bears the burden of proving an exception to the warrant requirement. *Holloway*, 290 F.3d at 1337. One such exception to the warrant requirement is a search conducted pursuant to a voluntary consent. *Schneckloth*. 412 U.S. at 219. Voluntariness of a consent to search is determined under the totality of the circumstances. *Id*. In order for consent to be

voluntary, it must be the product of a "free and unconstrained choice." *Id.* at 222; *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). Consent is not voluntary when it is prompted by a show of official authority. *Ramirez-Chilel*, 289 F.3d at 751. In other words, the inquiry is "whether 'the police conduct would have communicated to a reasonable person that the person was not free to decline the officer[]'[s] request[]' to search . . . ." *United States v. Butler*, 102 F.3d 1191 (11th Cir. 1997) (*quoting Florida v. Bostick*, 501 U.S. 429,439 (1991). Moreover, consent must also not be the product of an illegal seizure. *Santa*, 236 F.3d at 276-77 (following *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Here, Defendant argues that his alleged consent to search his truck and/or wallet are the product of prior illegalities by law enforcement. Specifically, Defendant argues that Gupton acted as an agent for law enforcement when he inspected the meter at the residence, and thus the search of the residence was illegal. The Defendant further asserts that since the initial search of the residence was illegal, the items seized from the Defendant's truck and wallet should be suppressed because it was the fruit of the initial illegal search. Additionally, although not argued in the Defendant's motion, the Defendant's attorney claimed at the evidentiary hearing that Detective Morales illegally detained the Defendant, and as such, any items seized from the Defendant's truck and/or wallet should be suppressed as fruit of the illegal detention.

Search of the Defendant's Truck

The Defendant does not contest that he provided Detective Morales with written consent to search his vehicle (Gov. Ex. 2), or that he waived his *Miranda* rights (Gov. Ex. 3). Rather, the Defendant asserts that his consent to search his truck was invalid because it was

6

the product of law enforcement's initial illegal search of the residence by using Gupton as an agent of law enforcement, and/or Detective Morales unlawful detention of the Defendant. "For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not the product of the illegal seizure." *Santa*, 236 F.3d at 676. Under this standard, the voluntariness of consent is only a threshold requirement; voluntariness does not, in itself, remove the taint of an illegal seizure. *Id*. The second inquiry focuses on causation: "[w]hether, granting establishment of the *primary illegality*, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*.(*quoting Wong Sun v. United States*, 371 U.S. 471, 488 (1963))(emphasis added) .

In this case, before proceeding to the two factors outlined in *Santa*, the Court must initially determine if there was a primary illegality. Defendant's main contention is that Gupton was acting as an agent of the police when he entered the property and inspected the meter, and as such, Gupton's search was illegal. The Fourth Amendment protection against unreasonable searches and seizures does not apply to a search by a private party unless he acts as an instrument or agent of the government. Courts look at two factors to determine whether a private person should be considered an agent of the government: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends. *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). Here, Detective Morales obviously knew of and acquiesced in Gupton's inspection of the residence. Thus, the Court's inquiry must focus

7

on the second requirement, that is, whether in conducting the search Gupton was motivated by assisting law enforcement or by furthering TECO's own legitimate interests.

Clearly, TECO has a legitimate business interest in ensuring that its electricity is not stolen (Gov. Ex. 1). Further, it is also clear that TECO, through its designated employees, has a lawful right to enter the premises of its customers to inspect and maintain its property. To this end, it is understandable that TECO would employ Gupton as a Revenue Protection Inspector to investigate any and all tips about the theft of electricity, whether the tip came from an anonymous citizen or from the police. Contrary to the Defendant's assertion, just because a tip is received from the police, TECO's inspector does not thereby become an agent of the police. Arguably, a dual motive may exist for Gupton's inspection of the residence, but as long as Gupton acted with the independent motivation to further TECO's interest, then Gupton was not acting as a law enforcement agent. *See United States v. Cleaveland*, 38 F.3d 1092 (9th Cir. 1995); *United States v. Allen*, 289 F. Supp. 2d 230, 244 (N.D.N.Y. 2003). Although Gupton's inspection of the residence may serve both TECO's interests, as well as law enforcement's interests, it is clear to the Court that Gupton's actions were designed to further the legitimate business interests of TECO. As such, Gupton did not act as an agent for law enforcement and his search of the residence was not illegal.

As noted previously, although not argued in the Motion, the Defendant's attorney also asserted that Detective Morales illegally detained the Defendant on the back porch/deck of the residence. To justify a detention, an officer must have a reasonable suspicion based on articulable facts that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion is something less than probable cause, but more than an "inchoate and

unparticularized suspicion or 'hunch.' " *Id.* at 27. Reasonable suspicion requires that the officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir.1990) (citation omitted). Further, reasonable suspicion is determined by the "totality of the circumstances" such that, while some individual factors may be "consistent with innocent [conduct] . . . [they can also], when taken together, give rise to a reasonable suspicion." *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003).

Here, although the Court questions whether the Defendant was actually detained on the back porch/deck of the residence, the Court finds that Detective Morales had sufficient articulable facts for an investigatory detention of the Defendant. Specifically, Detective Morales was armed with the information he obtained from the Miami-Dade police indicating that the residence may be operating as a marijuana grow house, coupled with the information he had just received from Gupton that there was an illegal tap on the power lines designed to steal electricity at the residence. Thus, under the totality of the circumstances, the Court finds that the Defendant was not unlawfully detained on the back porch/deck of the residence.

Based upon the Court's conclusion that neither of the Defendant's alleged illegalities consisted of any unlawful conduct by law enforcement, the Court then does not need to address the factors outlined in *Santa.* Thus, the remaining issue before the Court is whether under the totality of the circumstances the Defendant's consent to search his truck was voluntary. In light of the written consent form executed by the Defendant, which fully explains the Defendant's rights, the Court is satisfied under the totality of the circumstances

that the Defendant's consent to search his truck was given knowingly and voluntarily. Thus, the Defendant has failed to establish that the items seized from his truck require suppression.

Search of the Defendant's Wallet

Based upon the Court's findings that the Defendant has failed to establish any primary illegality by law enforcement, the Court need only examine under the totality of the circumstances whether the Defendant voluntarily gave his consent to search his wallet. However, the Defendant asserts in his Motion that he never gave Detective Morales consent to search his wallet. Detective Morales was the only witness who provided testimony as to this issue, and Detective Morales stated that the Defendant did consent to the search of his wallet. The Court accepts Detective Morales' testimony as credible and finds that the Defendant provided verbal consent to search his wallet. Accepting Detective Morales testimony, the Court must then determine if the consent was voluntary. In light of the fact that the Defendant's verbal consent to search the wallet was obtained after the Defendant executed a waiver of *Miranda* rights form, and a consent to search form, both of which thoroughly explained the Defendant's rights, the Court finds under the totality of the circumstances that the Defendant's verbal consent to search his wallet was given knowingly and voluntarily.[3] Thus, none of the items seized from the Defendant's wallet warrant suppression.

---

[3] The Court notes that even if the Defendant did not give Detective Morales verbal consent to search the wallet, Detective Morales search of the wallet would still have been valid as a search incident to the Defendant's arrest, or as an inventory search, which would have been conducted at the jail, just as Detective Morales informed the Defendant.

10

Conclusion

Based on the record and the totality of the circumstances, Defendant has not shown that a primary illegality existed or that his consent to search his truck and/or wallet was not voluntary.

Accordingly, it is **RECOMMENDED** that the Defendant's Motion to Suppress Physical Evidence (Dkt. No. 139) be **DENIED**.

**IT IS SO REPORTED** at Tampa, Florida, this 6th day of May, 2010.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

**NOTICE TO PARTIES**

The parties stipulated at the hearing held on May 3, 2010, that any objection to the proposed findings and recommendations contained in this report would be filed within SEVEN (7) days from the date it was served on the parties. Accordingly, failure to file and serve written objections to the proposed findings and recommendations contained in this report within SEVEN(7) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) *(en banc).*

Copies furnished to:

The Honorable Virginia M. Hernandez Covington
Counsel of Record